GEORGIA PENITENTIARY COMPANIES NOS. 2 AND 3 *vs.* NELMS, PRINCIPAL KEEPER, *et al.*

[JACKSON, Chief Justice, being disqualified on account of relationship to members of the plaintiffs in error, did not preside. Judge STEWART, of the Flint Circuit, was appointed to preside in his stead.]

1. The act of 1876, authorizing the governor to lease the convicts of this state to the penitentiary companies, is constitutional and valid.
2. The contracts of lease made by the governor with the penitentiary companies are valid and binding, both upon the state and the companies.
3. The joint resolution of the general assembly of this state, of 1883, authorizing the principal keeper of the penitentiary to turn over

two hundred and fifty convicts to the Marietta & North Georgia Railroad Company, is unconstitutional and void, first, because it impairs the obligations of the contracts made by the state with the penitentiary companies; and, second, because the state cannot part with the police power of the state over the convicts.

4. Under the act of 1876, the Marietta & North Georgia Railroad Company was entitled to have the service of two hundred and fifty convicts for three years; and after said railroad company has had the service of two hundred and fifty convicts for three years, the penitentiary companies are entitled to the same, and the railroad company is entitled to no more, unless the railroad company can bring itself within the proviso of the act of 1876, by showing that, as an incorporated railroad company, at the time when the act of 1876 was passed, it was working convicts on its road, and was entitled to a re-lease of convicts. Whether the railroad company, as such, by authority of the state, was working convicts when the act of 1876 was passed, and whether it applied for and made a contract of re-lease of convicts from the state before the state leased the convicts to penitentiary companies 1, 2 and 3 for twenty years, are questions of fact to be ascertained by the jury on the trial of this case.

(a.) That a court of equity has the power to enjoin the railroad company from receiving, and the principal keeper from delivering, convicts, and, upon final decree, to require the railroad company to deliver up the convicts in its possession, should the railroad company fail to establish its right to receive any more, and should it be determined that the railroad company has had the service of two hundred and fifty for three years.

(b.) That the injunction heretofore granted in this case be so modified as to enjoin the principal keeper (Nelms) from delivering, and the railroad company from receiving, any more convicts, until its right to receive more shall have been established by law.

(c.) That complainants enter into bond, with security, conditiontioned to pay the railroad company any damages which it may sustain on account of the service of convicts which may hereafter be turned over to complainants, in the event that the railroad company shall establish the fact that it was entitled to the service of such convicts.

(d.) That complainants may amend their bill on the trial of this case, and have any claim for damages determined which they have heretofore, or may hereafter sustain, on account of the loss of service of convicts received by the railroad company to which it was not entitled.

5. Under the contracts between the state and the penitentiary lessees, the lessees have a vested right to the labor of the convicts so

leased, and the legislature has no power, under the constitution and laws of this state, to deprive the lessees of this right to the labor of the convicts thus leased.

6. That the police powers of the state over the convicts leased to the penitentiary companies are reserved and secured, by the terms of the contracts of lease, to the state, so that the state has entire control over the moral and physical condition of the convicts, a d can make all needful and necessary regulations as regards the safe-keeping, feeding, clothing, and medica treatment of the convicts.

7. Under the act of 1876, persons leasing convicts are called corporations, in the manner and for the purposes specified in the st tute. The state has the right to create an agency to aid it in the enforcement of the criminal law by having the convicts confined, guarded and worked at hard labor in terms of the sentences of the courts; and the state having in this manner, for its own benefit, contracted with such persons, could not take advantage of the fact that they are called corporations, and the railroad company claiming rights subordinate to the rights of the state, can take no advantage of the same.

January 11, 1884.    (Head-notes by the court.)

Constitutional Law. Penitentiary. Convicts. Contracts. Laws. Railroads. Marietta and North Georgia Railroad. Corporations. State. Before Judge HAMMOND. Fulton Superior Court. October Term, 1883.

On Sept. 24th, 1881, Georgia Penitentiary Company No. 2 and Georgia Penitentiary Company No. 3 filed their bill against Nelms, the principal keeper of the penitentiary, and the Marietta & North Georgia Railroad Co., alleging as follows :

" On February 25, 1876, the legislature of Georgia passed an act by which the governor of the state was authorized to lease the penitentiary convicts of the state for a term of twenty years.   On June 21, 1876, the governor, in pursuance of said law, entered into a contract with the Dade Coal Company, Georgia Penitentiary Company No. 2, and Georgia Penitentiary Company No. 3, by which he did lease said convicts to said three companies for the term of twenty years from April 1, 1879.   By the terms of the

contract, the Dade Coal Company was to have three hundred long term men, and to be kept up to that number, and the other two companies were to divide the remainder into two equal parts, and they were to be kept equal during the period of the lease.

" At the date of the passage of said act, the convicts were held under leases, which had been made in pursuance of the act of 1874. J. M. McAfee & Co. were lessees under that act, and held one hundred or more convicts, and the history of their lease was as follows:

" Haley, McAfee, Wallis, and ten others, organized a joint stock company, to be known as H. B. Wallis & Co., the business being to bid for and work convicts in constructing the Marietta & North Georgia Railroad, the profits in stock in the road or in property purchased to be joint after the payment of their expenses. Wallis was directed to make a bid for one hundred convicts to be worked on the road for twelve months. He changed the name to Wallis, Haley & Co., and made a bid for two years, which action of his was approved at a meeting of his company on March 26, 1874—nine members being present.

" On March 26, 1874, the state in writing leased to Wallis, Haley & Co , one hundred convicts for two years at $11 per head. On March 9, 1875, by executive order this lease was forfeited, and on the next day these convicts were leased to Field, McAfee, Tate & Co. Subsequently that lease was changed, and the convicts were again let to J. M. McAfee & Co., in October, 1875, and they held them when the act of 1876 was passed, under a lease which was to expire on April 1, 1876. J. M. McAfee & Co. were contractors to work on the Marietta & North Georgia Railroad, and prior to April 1, 1876, said railroad company had no lease of convicts from the state, and never had in its possession, and had not had in its possession, any of said convicts. After April 1, 1876, the McAfee convicts were turned over to it, under that clause in the act of 1876 which gave it two hundred and fifty convicts without charge

for three years. In July, 1876, what were known as the Stevens convicts, and in 1878 the Alexander convicts were delivered to said company, as a part of the two hundred and fifty mentioned in the act of 1876. From time to time convicts were delivered to that company, and on Dec. 17, 1880, it had had convicts under said two hundred and fifty. clause equal to two hundred and fifty for three years. The two hundred and fifty for three years would be equal to the labor of one man for seven hundred and fifty years, and said company had had convicts from April, 1876, to April, 1879, equal to four hundred and seventeen years, and from April, 1879, to April, 1881, four hundred and twenty-nine years, and from April, 1881, to the present, one hundred years, making a total of nine hundred and forty-six years, and an excess over its right under the statute of one hundred and ninety-six years.

" It was believed by Companies Nos. 2 and 3 that said railroad company was not-entitled to any convicts under the act of 1876, and they filed a bill in Cobb superior court to prevent the delivery of convicts to it. It was determined in that litigation that it was entitled to two hundred and fifty for three years, and said bill was dismissed before final trial and decree. Said railroad company claimed in that case that it held all the convicts received prior to April 1, 1879, not as a portion of the two hundred and fifty mentioned, but under a subsequent clause which authorized the renewal of leases to railroad companies, and that claim was supported by the affidavit of William Phillips, the president of the company, in which he stated that he persistently made the demand for two hundred and fifty convicts under the act of 1876, but was refused on the ground that the rights of said company did not attach until April 1, 1879.

"On September 25, 1876, said company had in its possession the Stevens and McAfee convicts, and it had given no bond. On that day the Governor passed an order requiring the bond to be given within ten days, and on the

30th day of that month it was given.  A copy is hereto attached marked Exhibit "A."

"From that bond it appears that the convicts then held by that company were a part of the two hundred and fifty mentioned in the act of 1876, and thus discloses the falsity of the claim above mentioned which was set up by the company.

"This bond could not be found pending the litigation before mentioned.  Complainant, by its attorneys, made diligent search and inquiry for the bond at the executive office, and it could not be found, and they had no way of establishing its contents.  Since the decision above referred to, the bond has been found, and for the first time it is within the power of your orators, by its production, to show the falsity of the claim above mentioned.  Since the decision referred to numerous convicts have been delivered to that company, and all of them in excess of what was due to it under the law.  They have been delivered to it by John W. Nelms, the principal keeper of the penitentiary, contrary to law and in disregard of the rights of Companies Nos. 2 and 3, which companies were entitled to share equally the convicts thus unlawfully delivered. He continues to deliver convicts to that company, and it is his purpose to do so until their number is largely increased.

The Marietta & North Georgia railroad company is insolvent.  Jonn W. Nelms resides in Fulton county, Georgia, and said Marietta & North Georgia Railroad Company is a corporate body and resides in Cobb county, Georgia.

"The prayer of this bill is as follows:

"That said John W. Nelms and said railroad company be made defendants and that subpœnas issue for them. That Nelms be enjoined from delivering any other convicts to that company.  That an account may be taken and a decree rendered against Nelms and said railroad ccompany for the value of the hire of the convicts unlawfully deliv-

ered by Nelms, as above shown, and that such other relief be granted as may be proper. That a receiver be appointed to take charge of the convicts in possession of said railroad company, and hold them subject to the order of the court. That general and all appropriate relief be granted.

Discovery is waived."

The bond attached as "Exhibit A," is as follows:

"STATE OF GEORGIA—County of Fulton.

"Know all men by these presents, that we, The Marietta & North Georgia Railroad Company, of the county of Cobb, principal, and R. F. Maddox, J. M. McAfee and W. A. Hoskins, securities, are held and firmly bound unto James M. Smith, as Governor of said state, and his successors in office, in the sum of ten thousand dollars, for the payment of which we bind ourselves, our heirs, executors and administrators, jointly and severally, firm y by these presents. Signed, sealed and delivered by us this, the 30th day of Sept., 1876.

"The conditions of the above bond are as follows: Said James M. Smith, as such Governor, under and by virtue of the authority vested in him by an act of the General Assembly of said state, entitled 'An Act to regulate the leasing out of Penitentiary convicts by the Governor authorizing him to make contracts in relation thereto, and for other purposes,' approved February 25, 1876, having furnished the directors of the Marietta & North Georgia Railroad, upon their application for the same          convicts, without charge, for the space of three years, as authorized by said act. Now, if said principal shall pay all expenses of said convicts, shall humanely treat said convicts, keep them securely without expense to said state, and manage them in accordance with the rules and regulations in force on the 3d day of March, 1874, for the control of said convicts; shall employ said convicts exclusively for the benefit of said Marietta & North Georgia Railroad, and not work them more than ten hours each day, nor permit them to work on the Sabbath, nor inflict corporal punishment upon any of them, unless the same shall be absolutely necessary to secure discipline; and shall not employ as guards for said convicts other convicts, commonly called "trusties;" and shall discharge said convicts immediately upon the expiration of the term for which he or she may have been sentenced, or when he or she shall have been pardoned; and shall, when this letting shall be ended by time or by cancellation by the Governor, return the convicts still on hand to the person authorized by the Governor to receive them, then this bond be void, else to remain of full force and effect.

"In testimony whereof, we have hereunto set our hands and seals, this the day and year first aforesaid.

MARIETTA & NORTH GEORGIA RAILROAD CO.,

By WILLIAM PHILLIPS, Pres't, [L. S.]

R. F. MADDOX,            [L. S.]

J. M. McAFEE, Director, [L. S.]

W. A. HOSKINS,           [L S.]"

The bill was sworn to by B. G. Lockett, president of Company No. 2.

On the hearing of the application for injunction, Judge Hillyer, who then presided, refused it, on the ground that the superior court of Fulton county had no jurisdiction in the case, and that the court could not enjoin the principal keeper of the penitentiary in the matter of disposing of convicts. It was ordered, however, that both parties be enjoined until a decision could be had in the Supreme Court. That court reversed the judgment below, and held that the superior court of Fulton county had jurisdiction, and could enjoin the principal keeper. (See 67 *Ga. Rep.*, 565.)

The penitentiary companies amended their bill, and alleged, in brief, as follows: The value of the hire of 250 convicts per annum is at least $50,000; but owing to the peculiar nature and character of the property, they cannot ascertain at law the damage done to them, and it is irreparable. On information and belief, it is stated that the Marietta & North Georgia Railroad is indebted to the state $62,898.00, for which the state has a first lien on its property; that it also owes a large amount to one West, and others, and could not pay damages if recovered against it; neither could Nelms, and as to this case, both are insolvent. Nelms well knows, from the records in his office, that the railroad has received more convicts than it is entitled to under the act of 1876; but he and the railroad company have combined to deprive complainants of the labor of 250 convicts, without any color of right.

" Complainants further state, upon information and be-

lief, that the said railroad company has kept the convicts furnished to it since April 1, 1876, at work on said railroad but a small portion of the time; but has kept them most of the time on other works in which said railroad company had no interest whatever, and aas perverted the use of said convicts from the work of grading said railroad, for which purpose said convicts were furnished by the state, which wrongful conduct of said railroad company has all the time been well known to the said Nelms. But that the said Nelms, with such knowledge, has continued to deliver convicts, as charged in said bill, well knowing that their labor would in a great measure be misapplied as aforesaid.

"Discovery is hereby waived, and complainants pray that the convicts now in possession of said railroad company be placed in possession of complainants."

This amendment was also sworn to by Lockett.

Nelms filed his separate answer, in brief, as follows:

He is a mere executive officer, and has no pecuniary benefit or interest of any kind in the matters set forth in the bill; admits that the railroad company has been, up to the time of filing said bill, receiving convicts from aim as principal keeper of the penitentiary, and that, as appears from the books in his office, said railroad company has received in all as many convicts as would in the aggregate be equal to one man for nine hundred and forty-six years, yet he denies that it is now, or ever was, his purpose or intention to deliver to that company, after the first day of April, 1879, any more convicts than such a number as would give said company two hundred and fifty for three years.

"When this defendant came into office as principal keeper of the penitentiary, it was his understanding, and he found from the books and records of his office, and from information of James M. Smith, before then governor of the state of Georgia, that the said governor had leased or farmed out all the convicts then in the penitentiary, and

all who might become convicts up to the first day of April, 1879, and had also provided for the leasing of the convicts from the 1st day of April, 1879, for twenty years.  The books and records of this defendant's office showed that there were 616 convicts on the 1st of April, 1874, and that number was made the basis of leasing under the act . of 1874, both of the right to receive and the obligation to take all incoming convicts, by the several lessees, up to April 1st, 1879.

"The lessees under the act of 1874, and the number of convicts originally taken by each lessee, are as follows : The Dade Coal Mine Company, 100; J. T. & W. D. Grant, 150; Smith & Taylor, 100; Henry Stevens, 50; the North Eastern Railroad Company, 50 ; Wallis, Haley & Co., and their successors, for the Marietta & North Georgia Railroad Company, 100 ; George D. Harris, 50 : and that of all the convicts thereafter coming in each lessee was to take and receive *pro rata*.  On the 20th October 1875, there were ten different squads or forces working under the five years' lease under the Act of 1874, and the change under said act.  Amongst these changes, the North Eastern Railroad Company had surrendered its convicts, and the same had been released to Thomas Alexander, and the said Marietta & North Georgia Railroad Company had possession of the convicts that had been nominally leased to Wallis, Haley & Co., and their successors, and these convicts were working out the five years' lease under the act of 1874.  And this change was recognized both by the lessees and the state."

That the new companies, called Penitentiary Companies Nos. 1, 2 and 3, claimed, after their organization, to be working out the five years lease under the act of 1874 ; and also to have been organized by the surrender of certain convicts by the Marietta & North Georgia Railroad Company.  They claimed a distributive share of convicts under the act of 1874, the only change being that according to an agreement between themselves, the Dade coal mine company

was to have 300 convicts, and was to be kept up to that number until the 1st of April, 1879. Those rights and obligations were recognized and acted upon by each and every one of the lessees, with the exception of the said Marietta & North Georgia Railroad Company, which claimed as its proportion more than had been assigned to it. When the administrators of Thomas Alexander surrendered the convicts held by said Alexander individually, numbering about 71, said convicts were claimed by William Phillips, president of the Marietta & North Georgia Railroad Company, for said company; and W. D. Grant objected to the claim and in adjusting the claim of said company, this defendant was allowed to turn over to said Phillips, as president aforesaid, about 50 of said convicts as the share of the railroad company, under the lease act of 1874.

That he also furnished the railroad company from the jails such convicts as were adjudged to be its share or proportion, under the leases made under the act of 1874, up to the 1st of April, 1879, but the number so furnished was never so great as it was entitled to under the act of 1874 —probably not half what it was so entitled to.

" As principal keeper of the penitentiary, he did, on and after the 1st April, 1879, under the lease act of 1876, and the contracts made under the same. propose to turn over to the Marietta & North Georgia Railroad Company 250 convicts, competent to labor on a railroad, but was prevented from doing so in consequnce of objections made thereto by the complainants, which objections were supported, as defendant was informed, by the attorney general. Acting under the order of the governor, this defendant distributed the convicts under the act of 1876, and instead of making the number held by the Marietta & North Georgia Railroad Company up to 250 men competent to work on a railroad, he took from said company thirty-four able-bodied men.

"Except the four convicts surrendered by the Marietta

& North Georgia Railroad Company, there was no distribution or assignment of convicts under the act of 1876 until the 1st of April, 1879."

That under a resolution of the general assembly of 1879, he was proceeding to furnish to the railroad company, as directed by said resolution, 100 convicts from the jails, believing the same to be legal, just and right, but was taking no convicts from complainants.

That when this defendant came into office, he found the bond of the railroad company for the convicts then held by it under the act of 1874, said bond being for $10,000.00, with R. F. Maddox and others as sureties. The sureties were perfectly good for the amount of the bond. The railroad company, by its proper officers, also demanded 250 convicts, under the first section of the act of 1876, and tendered good and sufficient bond to comply with the law, and this tender was made both before and on the 1st of April, 1879. Said company also demanded the 100 convicts under the resolution of the legislature of 1879, and tendered good and sufficient bond, under the resolution and the law.

" The bond of said company found in this defendant's office when he became principal keeper of the penitentiary, was demanded by and given to a member of the penitentiary committee of the general assembly of 1878–9, whose name defendant does not remember. It was during the session of the general assembly, and the bond has never been returned to defendant's office, and he is unable to find it in any department of the capitol after diligent search."

That since the above statements were made, a bond has been found, a copy of which is attached to complainant's bill. Defendant is not able to say whether this bond was the bond on file in his office when he came in or not.

" In April, 1879, on the re-distribution of convicts, I turned over and left with my co-defendant 150 convicts on the order of the governor."

The Marietta & North Georgia Railroad filed its separate answer alleging, in brief, as follows:

Complainants and the Dade Coal Company may have made with the governor the contract claimed, but if so, it was not authorized by the act of 1876; but the contract would not include convicts going to the railroad under the second clause of the first section of that act and the provisos of that section, and it was so distinctly understood. Denies that any of the convicts in its possession on April 1st, 1879, should be charged against it as part of the two hundred and fifty allowed it by the act of 1876; and denies that it has received that number.

. " By the proviso to the second clause of the first section of the act of 1876, it is provided that if any railroad company had at that time any lease of convicts, and was working them at that time on its road, and its lease should expire before the leasing contemplated by the act of 1876 should be made, then said company might re-lease said convicts and as many more as it might desire, until its road was entirely completed.

"At the time of the passage of said act, this defendant was the lessee of 100 convicts under the act of 1874, under a lease to expire 1st of April, 1876, and was working them on its road, and had, under such lease, all the rights of the other lessees as to new convicts that might be sentenced."

That this lease was in the name of J. M. McAfee & Co., who were only trustees for the company, and were so known and recognized by the legislature and governor At the date of the passage of the act of February 28, 1876, and of the lease act of 1876, this was the only railroad working convicts on its road. Just before April 1, 1876, this defendant called the attention of the governor to the lease act of 1876, and the act of February 28, 1876, and the governor determined that this defendant had a right to retain the convicts it had whose terms expired on April 1, 1876, and to be considered a lessee under the proviso in the second clause of the first

section of the lease act. (See acts 1876, pages 40 et seq.)
The president of the railroad (Mr. Phillips) then demanded
the convicts and a re-lease, to which the governor agreed.
As the company did not have to pay hire for the re-leased
convicts, no bond was taken or required, nor was any
formal contract or lease signed;     it was notified to the
principal keeper of the penitentiary, and all parties acted
on the basis of it.

That when the Alexander convicts, numbering about 70,
were surrendered, W. D. Grant, of Company No. 2, insisted
that the quota of the railroad was only 50, and it received
them as lessee under the act of 1874, by reason of the pro-
viso in the act of 1876; and so were all the convicts re-
ceived by it up to April 1, 1879, as was known to com-
plainants. So far from believing that the convicts received
by the railroad from April 1, 1876, to April 1, 1879, were
a part of the 250 to which they were entitled for three
years, under the act of 1876, members of companies Nos.
2 and 3 had made affidavits that when they contracted
with the governor they believed the railroad was not en-
titled to 250 at all, but that after April 1, 1879, the three
companies would receive them all.

"After the contracts of lease with the complainants and
Penitentiary Company No. 1 and the governor were
signed, it was found impossible to organize the companies,
and Company No. 2, by reason of the fact that none of
said lessees under the act of 1874 were willing to surren-
der any convicts, and each claimed its right to have its
quota of new convicts, so that there were no convicts for
Penitentiary Company No. 2 to take or to get until 1st of
April, 1879.

" In the winter of 1876–7, say about 21st December, 1876,
four convicts were assigned to defendant—newly sentenced
convicts, to which none but lessees under the act of 1874
were entitled, which this defendant certainly was only
entitled, as lessee under the act of 1874, and the proviso
to the 2d clause of the act of 1876. Governor Brown,

Lockett, Low, Grant and other members of the said several companies, including complainants, induced the defendant to surrender to the state the said four convicts that the said companies might organize " This was done, and they entered into some sort of contract among themselves, not material here. This estops them from denying the rights of this defendant.

" In relation to the bond which is claimed to be newly discovered, defendant says that, * * * two bonds were given on contract accounts, as I remember, in September, 1876, one for the convicts then held by defendant under the renewal of lease of J. M. McAfee & Co., and the other to make good the application filed with the governor 1st of April, 1876, for 250 convicts for three years. Defendant cannot state from recollection the terms and stipulations in either bond, but does remember the facts and circumstances leading to the execution of two bonds."

Has caused search to be made for bond; is informed that it was delivered to a member of the penitentiary committee; feels sure it was before that committee, " and this defendant feels sure that the bond now presented and comprised in their bill, and considered by them as conclusive, was not the bond before said committee."

The whole matter has been twice before the courts, and there is nothing new in the present case, unless it be the discovery of the bond, which at best is only cumulative.

Such was the answer, which was sworn to by Wm. Phillips, vice-president of the railroad.

On October 16, 1883 the bill was amended by alleging, in brief, as follows:

The allegations concerning the contract of lease by complainants, and that they have complied with their part of the contract and their duty under the law, are repeated; also, that the railroad company has received largely more than 250 convicts for three years. The last general assembly passed the following resolution, which was approved September 26, 1883:

v 71–21

*Resolved,* by the senate, the house concurring, that the governor be and he is hereby instructed to direct the keeper of the penitentiary to turn over to the Marietta and North Georgia Railroad Company one hundred and fifty able-bodied convicts, to be worked for the benefit of said railroad company for the full space of three years, or until the main line of said road is completed to the North Carolina line, and the Duck Town branch is completed to the Tennessee line, and the Dahlonega branch is finished to its intersection with the Gainesville and Dahlonega Railroad.

*Resolved, further,* that no more women convicts nor old and infirm convicts be furnished said company.     .

This resolution was approved by the governor September 26th, 1883.

The convicts mentioned are part of those embraced in complainants' contract, and for which they pay hire; the railroad company has no shadow of right to them; and this resolution violates their contract with the state, and impairs its obligation.

The prayer was the same as in the former bill, and that Nelms be enjoined from delivering, and the railroad company from receiving, said convicts. This amendment was sworn to by W. D. Grant, president of Co. No. 3, and B. G. Lockett, president of Co. No. 2.

The Marietta & North Georgia railroad answered this amended bill, in brief, as follows: Denies that there were any such corporations as complainants at the time of the making of the alleged contract. Reiterates that, under the act of 1876, it was entitled to 250 convicts from April 1, 1879; that being an incorporated railroad and having about 100 convicts at work on its road, it was entitled to a re-lease of them or so many more as it needed on the line of its road until completed. It has now 156, of whom 130 are able to do railroad work. Admits the passage of the resolution of 1883, and states that a bond has been prepared thereunder by the governor, which it has forwarded to Kinsey, its president, who lives in Cincinnati, Ohio; but denies that the resolution is violative of any valid contract; and asserts that it was passed with the formality of an act.

A demurrer to the bill was also filed.

The application for injunction came on to be heard before Hon. W. R. Hammond, and the following evidence was introduced:

A contract between the governor, representing the state, the Dade Coal Co., and certain persons composing "Georgia Penitentiary Company No. 1," also No. 2 and No. 3. This contract was dated June 21, 1876. It recited that, under the lease act of 1876, advertisement had been made for bids for all the penitentiary convicts; that Lockett, Jordan, Lowe and Gordon had made a certain bid; Alexander, Grant, Simpson, Murphey and Howell had made another; and the Dade Coal Company a third; that

"WHEREAS, all of said bids are, in the opinion of the governor, too low, and he has informed said bidders that he cannot accept their bids upon the terms and for the prices therein specified; but that the said three companies may take the whole of said convicts for the sum of five hundred thousand dollars, to be paid in twenty equal annual installments commencing at the end of the first year after the termination of the present leases, the Dade Coal Company taking the three hundred long-term men bid for by it, to be kept up constantly to that number of able-bodied men, if there be, and so long as there shall be, so many in the penitentiary, to be used in mining, as provided by the statute; and the other two companies dividing the remainder into two equal parts, and the number that each of the two last mentioned companies has shall be kept equal during the period of the leases; the convicts held by each company to be employed in the labor specified in the statute. The annual installments to be paid into the treasury of the state at the end of each year during the said period of twenty years; such installment being the sum of twenty-five thousand dollars—each of said companies to pay its pro rata share of said sum. The principal keeper of the penitentiary, under the direction of the governor, shall adjust the pro rata shares of said sums between said companies in proportion to the number of convicts held by each during the year; but in no case shall such adjustment operate so as to reduce the annual rental of said convicts below the sum of twenty-five thousand dollars. Each company shall pay the amount of annual hire fixed by such adjustment promptly on the last day of each year.

" And the said three companies, each acting for itself as a separate and distinct company, and each assuming its own proportion of the obligations above mentioned, and no more, having accepted the foregoing modifications of their respective bids, suggested by the governor: *It is agreed* by said companies, each one acting separately for

itself, and by James M. Smith, governor of said state, that the said convicts be leased to said three companies above mentioned, ih the proportion as to the number and upon the terms hereinbefore specified —each company to give bond, with approved security, for its own part of the obligation devolved upon it by the acceptance of the bid, modified as aforesaid, in the fol owing sums, to-wit:

"The Georgia Penitentiary Company No. 1, composed of the said Dade Coal Company, in the sum of twenty-five thousand dollars;

"The Georgia Penitentiary Company No. 2, composed of B. G. Lockett, L. A. Jordan, W. B. Lowe and J. B. Gordon, in the sum of thirty-seven thousand five hundred dollars; and

"The Georgia Penitentiary Company No. 3, whose stockholders are Thomas Alexander, William D. Grant, W. W. Simpson, John W. Murphey and William H. Howell, in the sum of thirty-seven thousand five hundred dollars.

"Each of said bonds to have proper conditions for the management, control, and safe keeping of said convicts, according to law, and to the rules and regulations prescribed for the government of the penitentiary.

"And, in view of the fact that existing contracts of lease may be canceled before the 1st day of April, 1879, (the time at which all the present leases expire) it is further agreed that in all such cases the lessees under this contract shall take possession of all convicts which may thus fall upon the hands of the state, and shall hold, manage and control the same according to the provisions of this contract, and of their bonds given under the same, and shall be respectively bound to pay for said convicts until the said 1st day of April, 1879, at the rate of eleven dollars per capita per annum."

This was signed by the governor, and by the parties composing the three companies—those composing Nos. 2 and 3, adding the same after their names.

The bond given by "The Georgia Penitentiary Co. No. 3," with Alexander, Grant, Simpson, Murphey, and Howell, as securities, dated June 21, 1876, for $37,500.00, conditioned for the safe keeping of convicts, payment of its proportion of annual rental, etc., was introduced.

Also an executive order, which recited the lease act, the lease made, and

"ORDERED, That the names of said lessees be entered on the mintes of the executive department, and that the said contracts of lease or hiring be, and the same are hereby accepted by the governor; and that the said Dade coal company shall constitute a corporation to be known as Georgia Penitentiary Company No. 1; and that B.

G. Lockett, L. A Jordan, W. B. Lowe, and J. B. Gordon shall and are hereby declared to be a corporation under the laws of this state, known as Georgia Penitentiary Company No. 2; and that Thomas Alexanaer, Wm. D. Grant, Wm. W. Simpson, John W. Murphey, and Wm. H. Howell are hereby declared to be a corporation under the laws of this state, known as Georgia Penitentiary Company No. 3."

Also the following communications :

"EXECUTIVE DEPARTMENT, STATE OF GEORGIA,
ATLANTA, GA., July 5, 1876.

" GEN. WM. PHILLIPS, *Marietta, Ga.*

DEAR SIR: I am directed by the governor to say that the bond required of the Marietta & North Georgia Railroad Company for the maintenance, safe-keeping and proper management of the convicts assigned to it by the last legislature should be made without unnecessary delay. He requests, therefore, that the parties authorized to execute said bond appear at the executive office in Atlanta at an early day for that purpose.

The amount of the bond is ten thousand dollars.

I am, sir, your ob't serv't,
J. W. WARREN, *Sec. Ex. Dept.*"

"EXECUTIVE DEPARTMENT,
ATLANTA, GA., July 26, 1876.

" GEN. WM. PHILLIPS, *Marietta, Ga.*

DEAR SIR: The governor directs me to call your attention to the fact that, on the 5th day of July instant, a letter was addressed to you by his direction, in which the necessity of executing a bond for the safe-keeping and proper management of the convicts assigned by an act of the last legislature to the Marietta & North Georgia Railroad Company was clearly stated, and you were requested to attend to the matter without delay. No reply to said letter has been received, and the governor now directs me to repeat and emphasize the request made therein, as above referred to.

I am, sir, your ob't serv't,
J. W. WARREN, *Sec. Ex. Dept.*"

Also, the following executive order:

" EXRCUTIVE DEPARTMENT,
ATLANTA, GA., September 25, 1876.

" *To the Principal Keeper of the Penitentiary:*

" WHEREAS, the Marietta & North Georgia Railroad Company have not given bond for the convicts in their possession, as required by law; and whereas, the convicts in the possession of said company have not been kept at hard labor on said railroad, according to the intent and meaning of the law in the premises; it is therefore ordered that the said Marietta & North Georgia Railroad Company

be allowed ten days from this date within which to execute and deliver said bond, and to place all of the convicts in their possession at labor on the Marietta & North Georgia Railroad, and that in default thereof, you proceed at once to take possession of said convicts, that they may be disposed of according to law. It is further ordered that you serve, or cause to be served, a copy of this order upon the president of said company, or upon any one of the directors thereof at once.

JAMES M. SMITH, *Governor.*

By the Governor:
    J. W. WARREN, *Sec. Ex. Dept."*

The depositions of J. W. Warren were, in brief, as follows: Have been connected with the executive department for about ten years, and secretary of that department; wrote the original bond, of which a copy is attached to the bill as exhibit "A."; the original is in the executive office, and has on it the following indorsement, in the handwriting of ex-governor James M. Smith: "Bond M. & N. G. R. R. for pen'ry convicts. Filed in office September, 1876." This is not signed. This paper was made, as deponent understood, in pursuance of the above executive order; does not know who brought it to the executive office; remembers Governor Smith told him to draw up a bond, probably in anticipation of the parties coming to execute it; does not remember the actual mechanical operation of writing it; cannot of his own knowledge and remembrance say who signed said bond and why it was filed; knows of no reason therefor, unless it be that the company was required to file a bond within ten days, under the executive order. In early part of 1881, at instance of Judge Hopkins, searched for this paper, and failed to find it. "A month or two after this search, in looking after some other matters, I found the paper in an old safe in the office of the attorney-general of Georgia. Said safe had been used in the executive department, and afterwards moved to the office of the attorney-general. The only search I had made was the one spoken of at the instance of Judge Hopkins."

Affidavit of R. F. Maddox, in brief, as follows: About July 4, 1876—not before—the Stevens convicts, numbering

about fifty, were turned over to the road; about that time or soon after, deponent signed, as security, bond of road for about $10,000.00, conditioned, as required by law, to keep and work said convicts; thinks that in August, 1878, when administrator of Alexander turned over about fifty convicts to the state, and by it to the company, he signed a similar bond for same amount as to them.   Stock of railroad company was originally $55,000.00 to $60,000.00.  In the spring of 1878, about $35,000.00 or $40,000.00 of stock was transferred without pay to deponent, Messrs. M. W. Phillips, C. D. Phillips, N. S. Eaves, J. M. McAfee, and Wm. Howell, on condition that they would finish the road to Canton by May 1, 1879, which was done.

By a subsequent affidavit, Maddox stated that the bond attached to complainant's bill was the one referred to by him as having been signed about July 4, 1876.

The affidavit of C. B. Howard, in brief, as follows: Was a member of the firm Wallis, Haley & Co. (though his name did not appear in the bond, it having been executed during his absence), who bid for and obtained one hundred convicts from the state for the purpose of taking labor contracts.   The primary object was to bid for the work to be done in grading the Marietta & North Georgia Railroad. The firm contracted with the railroad company to construct the road at a given price per cubic yard.   They were to receive payment in cash to the amount of expenses for hire of hands, feeding, etc., and for the balance certificates of stock were to be issued at par.   Arrangements were made for payments of subscriptions by subscribers otherwise than in cash if they so desired.   "In the winter of 1874–5 it became very evident that the subscribers to the road would not be able to pay their subscriptions in quantities sufficient to pay the running expenses of the contracting company, and in February, 1875, it was determined, at a meeting of the contracting company, Wallis, Haley & Co., to divide the company and its hands and assets, one part continuing their contract with the railroad company (hop-

ing that the subscribers would be able to support half the hands), and the other part taking their hands to Taylor county to work on a cotton plantation of J. B. Gordon, who agreed to join the Taylor county company. The division was effected, and the Taylor county portion left for the low country. Upon arriving at Atlanta with the convicts and stock, this deponent was stopped by an executive order, and the hands were not allowed to proceed. The contract of lease of Wallis, Haley & Co. was annulled, and a new company was formed with additional new members and most of the old members.  *   *   *

"This deponent further avers that the penitentiary companies receiving hands under the act of 1876, leasing the convicts for twenty years, secured their quota of hands under an arrangement among themselves, said hands falling into their hands by reason of the Marietta & North Georgia Railroad being unable to pay transportation and support, thus losing them by their own *laches.*"

A written instrument was introduced, which recited that the lease to Field, McAfee, Tate & Co. for 100 convicts had been annulled and cancelled, and thereupon re-let them to T. D. Evans, C. D. Phillips, W. A. Hoskins, H. M. Hammett, and William Phillips, to April 1, 1876, "subject to the terms mentioned in the bond hereto annexed, and the laws of this state." This instrument recited that it was "agreed and consented by James M. Smith, governor," and the parties above named. It was signed by them, but not by tne governor. It was dated at the executive office, Oct. 13, 1875.

Order of the judge of the superior court of the Atlanta circuit, dated January 31, 1877, incorporating the Georgia Penitentiary Company No. 3, was read.

Affidavit of James M. Smith, in substance, as follows: "Was governor in 1876, and as such, leased the penitentiary convicts to companies Nos. 1, 2 and 3, by contract of record in executive office, under act of February 25, 1876. Conversed, in negotiating, with John B. Gordon, Joseph E.

Brown and Thomas Alexander, who seemed to speak for their respective companies. The contracts of lease were to be made under the provisions of the act of 1876, and those provisions were, at one time and another during the pendency of the negotiations, very fully discussed between the gentlemen named and deponent: The rights of the Marietta & North Georgia Railroad Company under the act were referred to more than once between us, and deponent distinctly remembers that the interest of the company was spoken of very lightly, it being the opinion expressed that the company would not be able to take care of the convicts which the law gave it, and that the convicts would very soon have to be distributed among the other lessees. In all these negotiations, it was understood by me that the lessees would take the convicts subject to the provisions of the law under which the lease was to be made, and that the rights of said railroad company were secured by the provisions. The term of the lease was to be for twenty years, and the right of said company to 250 convicts was to be, under the law, for a period of three years, or until certain work had been done on the railroad. It was my understanding, and I thought the understanding of the gentlemen with whom I negotiated, that their companies were to take all the convicts under their contract after the railroad company's term expired, but that the law fixed the term of the railroad company, and that in any event the company was to have the convicts.

"My recollection is that the convicts which the said railroad company had on its road in the early part of 1876, after the expiration of the lease, say April 1, 1876, were permitted to remain in the hands of the company under a provision of the law which allowed an incorporated company to take a new lease of its convicts. General Phillips, for his company, contended that he ought not to give a bond. I required a bond to be given. This contention caused considerable delay, but at last the bond was given. Deponent's recollection is that the three years' term of

the railroad company was not to commence until April 1, 1879, when the twenty year term of the lessees was to commence. My recollection further is that no rental was charged the railroad company, because the legislature had indicated very clearly by its legislation that nothing was to be charged the company.

"In the absence of the record I cannot speak positively, but the best of my recollection is that the convicts turned over to the said railroad company were let upon the same terms as those which remained with the company at the expiration of the lease on April 1, 1879."

This affidavit was made November 26, 1879. Subsequently, on October 3, 1881, the same deponent made another affidavit, explaining a portion of the above, as follows: "Was called upon some year or two ago by the counsel of the Marietta & North Georgia Railroad to make a statement under oath of his recollection of the letting of convicts while affiant was in the executive office, to said company after the 1st day of April, 1876; that as affiant was then informed, the written evidence of said letting had been mislaid and could not be found; that affiant made an affidavit giving his then best recollection; that he stated in substance that said convicts were turned over, as he remembered, not as a part of the 250 convicts given to said company under the act of 1876; that such continued to be his recollection until the bond given by said company, when said convicts were turned over, was found; that said bond has been found, and affiant, upon reading it, finds that his memory was at fault, and now corrects his mistake, and says that the convicts turned over to said company after April 1, 1876, were furnished under the act of 1876, and were intended to be part of the 250 convicts given by the state to said company. Affiant further says, refreshed as his memory has been by reading said bond, he is now clear that he, as governor, caused to be delivered no convicts to said company after first of April, 1876, except as part of the 250 it was entitled to under the act of 1876."

Affidavit of P. W. Alexander, in brief, as follows : Was connected with the executive department in 1876 ; recollection is indistinct, but as far as it goes is, that " there was some trouble or confusion about certain convicts in the hands of the Marietta & North Georgia Railroad Company, and that as far as he has any recollection about it, said company executed two bonds for the convicts ; one for some temporary or formal purpose, and the other in obedience to an order of the governor issued about the time he sent M. Estes up to visit the camp of the convicts then in the hands of said railroad company."

Affidavit of A. W. Holcombe, in brief, as follows : Was a member of the state senate in 1879, and a member of the penitentiary committee. The committees of the two houses had before them a resolution directing 250 convicts to be furnished to the Marietta & North Georgia Railroad; took an interest in same and favored it. Deponent distinctly remembers that there was a bond of the company before said committee as evidence, the terms and conditions of which deponent cannot now recall to mind, but deponent has examined the bond on file in the executive office, a copy of which is appended as an exhibit to complainants' bill now pending before Judge Hillyer, and deponent feels sure that that bond is not the one which was before the committee as aforesaid.

An executive order was read, dated October 16, 1883, under the resolution of September 26, 1883, that so soon as the railroad company shall have executed a bond for $25,000.00, the principal keeper shall turn over to it, as rapidly as practicable, convicts sufficient to make, with those on hand, 250, " to be employed by said company as contemplated by said resolution and authorized by law."

The following communication :

"ATLANTA, GA., 1st April, 1876.

"*To His Excellency James M. Smith:*

As president of the Marietta & North Georgia Railroad Company, authorized by the directors of said company to represent them and the company, I make application, in the name and for the directors

of said company, for the number of convicts allowed and granted to said company under the provisions of the act "To regulate the leasing out of penitentiary convicts," etc., passed by the general assembly of 1876. The company is now prepared to take the convicts, to be used exclusively for the benefit of the road and to give satisfactory obligations to feed, clothe and provide for the same, under such regulations as your Excellency may require.

WM. PHILLIPS, *President*."

Testimony of William Phillips (offered by defendants), in brief, as follows: In 1874, Wallis, Haley & Company organized for the purpose of building the Marietta & North Georgia Railroad. They obtained a lease of 100 convicts for two years, at $11.00 per capita, per annum. The railroad company was re-organized, and contracted with Wallis, Haley & Company to do the work at stipulated prices. The railroad was to pay in cash a sufficient amount to defray actual expenses, and the balance in stock.

"The railroad company at that time did not have the means to pay these expenses, nor means to purchase tools and furnish necessary supplies to support the convicts, and for this reason Wallis, Haley & Co. sought and obtained a contract on the Fair Grounds at Oglethorpe Park, Atlanta, and there worked the hands for a short time. When subscriptions to the capital stock as was deemed sufficient had been paid in, Wallis, Haley & Co. brought the hands to Marietta, and commenced work on the grade, under the contract mentioned, but I do not remember that the advances made by Wallis, Haley, and Reid, and perhaps Hammett, were ever refunded to this day. H. B. Wallis was first in charge of the convicts, superintending the work, and until some three to five miles were graded, and then C. B. Howard, another member of the company, took charge and controlled the hands, and worked them until the grade was about completed to Little River, in Cherokee county. The railroad company failing to supply sufficient means to maintain the convicts and do the work, and for perhaps other reasons also, the company of Wallis, Haley & Co. divided; and C. B. Howard and his party

took one-half of the convicts and one-half of the property, as was agreed upon among themselves, and started them to Flint River to work them on a cotton farm. I notified the governor, and Governor Smith canceled the lease to Wallis, Haley & Co. On the division alluded to, about one-half the old members of Wallis, Haley & Co. united with others and organized a company known as Field, McAfee, Tate & Co., and took possession of the convicts left on the road. When Governor Smith canceled the lease of Wallis, Haley & Co. he re-leased all the convicts held by Wallis, Haley & Co. to Field, McAfee, Tate & Co. for the remainder of their term; that is until the 1st of April, 1876. The Marietta & North Georgia Railroad Company renewed, or rather made the same contract with Field, McAfee, Tate & Co., as with Wallis, Haley & Co. Additional subscriptions to the capital stock were obtained, but not sufficient to pay the expenses of working the convicts until the grade was completed to Canton. The individual members of the contracting company made advances to support the convicts, and have not as yet been settled with as contracted by the railroad company. When the grade reached Canton, Field, McAfee, Tate & Co. surrendered the convicts under their lease, and then another company was organized, known as J. M. McAfee & Co. This company was composed of J. M. McAfee, H. M. Hammond, (Hammett?) C. D. Phillips, W. H. Haskins and myself. We applied for the convicts held or surrendered by Field, McAfee, Tate & Co., and governor Smith re-leased to us on the same terms, and for the remainder of the original term of Wallis, Haley & Co., until the 1st of April, 1876. Additional subscriptions were obtained, and J. M. McAfee & Co. worked the convicts under the same contract with the railroad company as had been made with Wallis, Haley & Co., and with Field, McAfee, Tate & Co., except that there was no contract in writing with J. M. McAfee & Co. and the Marietta & North Georgia Railroad Company.

"The subscription was small, and not sufficient to sup-

port the convicts for only a few months. During this time the convicts were worked in extending the grade into Marietta, as Wallis, Haley & Co. had commenced outside of the city limits. They were also worked in sub-grading to prevent some washes and in getting out cross-ties and timber, as we then hoped to get iron, and a part were worked by W. A. Haskins in the Franklin gold mine. When the subscription gave out and we could get no more, we worked a part on the mill-dam and canal. W. P. Anderson had a part under him; a part in building fish pond for Maj. Winn. I worked a part on my farm, and for a few days in building a fish pond on home lot; a portion worked for Mr. R. C. Kerr, and for E. A. Withers. I don't now remember anybody else for whom the convicts held by J. M. McAfee & Co. worked. At the then prices of labor and prices of provisions during the winter months of 1875 and 1876, the convicts were a burden on J. M. McAfee & Co., and were worked about from place to place wherever one could get employment and make enough to support them, hoping that in some way we would be enabled to raise the means to put them regularly on the road. I have no means of knowing positively where the convicts held by J. M. McAfee & Co. were at work on the 25th day of February, 1876, nor what particular work they were doing, nor do I remember the exact number we then held; but my best recollection is, that J. M. McAfee & Co. had from eighty to one hundred convicts; that a portion were in camp near Marietta, and the others working in different squads for different people. These convicts were not leased to the Marietta & North Georgia Railroad Company, but to J. M. McAfee & Co., who held them for and in the interest of the Marietta & North Georgia Railroad as is stated in preamble to act of 1876 (I think page 1); and we held them not for individual profit, but for the purpose and with the hope, of making some arrangement to have them worked on the Marietta & North Georgia Railroad. We lost and suffered pecuniarily out of our own pockets,

and have never been refunded. We held these convicts until about the 1st of June, 1876, when having, as president of the railroad company, made an arrangement with the citizens of Fannin county to commence at the state line and grade through their county south of the Gilmer line, about the 1st of June, 1876, Geo. M. Manning and M. McKinney carried the convicts held by J. M. McAfee & Co. to Fannin, and commenced work on the grade at the state line ; except probably five convicts who were then working for J. M. McAfee, and some two or three left with W. A. Haskins on account of the severe illness of one who required care. My recollection is that, as they went up, a squad was left at the White Path gold mines, and worked in the mines by H. Van Wyck & Co. This squad remained at the White Path gold mines until, as I remember, in September, 1876, when they were carried to Fannin and added to the force on the grade." Impossible to give exact dates from memory. On or about April 1, 1876, applied in writing for convicts granted the railroad under lease act of 1876. Was impressed that meeting of directors had been held before April 1, and that witness, R. F. Maddox, and J. M. McAfee were appointed to make the application. On refreshing his memory, finds meeting was held May 10, 1876, and that parties named were then ' appointed to contract with the governor for the convicts allotted to the road, give necessary bond ; etc. Application by witness was made on April 1, 1876 ; presumes it must have been made under his general powers as president. " When I made the application, Governor Smith expressed a desire to do whatever he could as executive to advance the interests of the road ; but said that the convicts were disposed of by former leases under act of 1874, until the expiration of the five years' lease or rental, April 1st, 1879. The application was left with Governor Smith, and was filed in the executive department, and I suppose is now there." Is informed that on Feb. 25, 1876, no other railroad in the state was working convicts ; does not know it of

his own knowledge. " J. M. McAfee & Co. held the convicts, working them, as stated in the answer to the second interrogatory, until I had arranged to put them to work in Fannin county, as stated in answer to second interrogatory." Acted upon his convictions as to right of road to 250 convicts, and arranged to work the force in Gilmer and Fannin counties, and a partial arrangement to work a part on Ducktown branch, and tried to arrange for Pickens county to work remainder.

When Stevens convicts were surrendered, claimed them for road. Alexander, president of company No. 3, denied this right, as he claimed that all had been leased by companies Nos. 1, 2, and 3. The governor awarded them to the railroad, and they were carried to Gilmer county, some forty in number, as witness recollects.

" These convicts were worked by the citizens of Gilmer until they graded some five miles, or perhaps more. Pickens county and the citizens of Ducktown declined to take convicts to work on their part of the line."

On September 25, 1876, the governor required witness, as president, to give bond for the convicts they had. Alexander endeavored to prevent a bond being given; and witness insisted it was unnecessary, as an incorporated railroad stood upon a different footing from lessees of convicts; the governor required a bond. " My best recollection is that two bonds were made during this controversy, but I only remember with certainty to delivering one to Gov. Smith, and that one is the bond with the blank number of convicts. * * * My then convictions (were), that we were entitled to 250 convicts, and as many more as we needed. I remember no disagreement with Gov. Smith as to the law or the rights of the company, except that he required a bond, which I insisted was not required by the act, and that I insisted on the full *quota*, 250 convicts, and Gov. Smith said we could only get our *pro rata* until the expiration of the leases under act of 1874."

The administrator of Alexander surrendered, as witness

understood, about seventy convicts; witness demanded them for the railroad, but was informed that W. D. Grant objected, on the ground that the road had no right to convicts until April 1, 1879. Witness got about 50 of these convicts; heard that Gov. Brown received about 20. Lochrane, the attorney of Lockett's company, knows witness' claim; treated with him as attorney. About December, 1876, Penitentiary Co. No. 2, desired to organize, but could not do so, because none of the lessees would surrender any convicts to them. Lockett and Lowe urged witness to surrender some convicts to enable them to organize. Refused to surrender any from the road, but desired to aid them, if possible, without injury to the railroad. After consulting with McAfee, Hammett and Maddox, and the use of much persuasion with the last named, it was agreed that four convicts under sentence in the jail of Fulton county should be assigned to the railroad, and witness, as its president, should make a formal surrender of them to the state.

"It was proposed to give me a written obligation, supplemented by personal pledges, that the transaction should not in any way affect the rights of the Marietta and North Georgia Railroad Company, and Judge Lochrane, representing Lockett, knew well our claim. There was a meeting of the stockholders of the different companies, and I submitted the written agreement, a copy of which is on record in book of minutes. I cannot state positively all who were present, but Senator Joseph E. Brown, Colonel Thomas Alexander, Judge John L. Hopkins, Judge O. A Lochrane, B. G. Lockett, W. B. Lowe, and W. D. Grant, were of the number. I asked Governor Brown, as a friend of the enterprise, to read the paper, and as a lawyer and friend to give me his opinion as to whether the rights of our company would be jeopardized; and he did so, and stated that, in his opinion, I would run no risk. I then handed the paper to Judge Hopkins, who read it and said it was a recognition of our rights. All concurred in this

232    SUPREME COURT OF GEORGIA.

Georgia Penitentiary Cos. Nos. 2 and 3 vs. Nelms, principal keeper, et al.

opinion, and when the paper was signed, I walked over to the jail, and saw some prisoners whom I supposed to be convicts and who were pointed out to me as convicts, and then made a written surrender of these convicts, and sent it to the governor. Judge Lochrane was acting for Penitentiary Company No. 2, in having us make the surrender, and it was with him we treated and had our discussions principally. Senator Brown represented Penitentiary Company No. 1; Judge Hopkins, as I understood, represented Penitentiary Company No. 3; Judge Lochrane represented company No. 2. I do not know where the original agreement is.

"On the 1st April, 1879, or a short time before, my recollection is that I made a written demand for two hundred and fifty convicts for three years from 1st April, 1879. * * * Governor Colquitt ruled or decided that the Marietta & North Georgia Railroad Company had had as many as one hundred convicts from April, 1876, to April, 1879, and that our company was entitled to one hundred and fifty from 1st April, 1879, to 1st April, 1882, making two hundred and fifty convicts for three years. I don't know what became of the writing."

Reiterates the account already given of the application by witness for convicts, and the making of the bond attached to the bill, and says: "I wanted, and asked for, the two hundred and fifty convicts, and had arranged to work them, as I then thought; and my proposition as to working them had been indorsed by the directors at Elijay. Gov Smith said that he could not give us our *quota* as claimed, until the expiration of leases under act of 1874; and the fact that he held the bond without any specified number I regarded as holding to cover and make good the 'obligation' required by the governor under the statutes, when we should get our *quota*. I do not say that Gov. Smith said he would hold the bond for this special purpose; all that I recollect that he did say was that the convicts were leased under act of 1874, and that he could not

give us the two hundred and fifty convicts until the expiration of the lease of 1874. But his refusal to insert the number of convicts asked was to me a denial of two hundred and fifty until 1st April, 1879, and that he allowed us to hold the convicts we then held. As stated before, my impression is that the Marietta & North Georgia Railroad Company did execute another bond. I can recall no fact fixing exact time, place, or stipulations of said bond. My recollection is that it was signed by Maddox and Hammett, as treasurer of the securities, and my belief is, about the same time as the bond." The penitentiary committee of the legislature had a bond before them, with other papers; saw the bond in the office of the principal keeper; recollection is that senator Holcombe took it or had it; does not remember contents; did not read it, and can recall no fact which would enable witness to say whether the original of the bond copied above was before the committee or not. Wallis, Haley & Co., Field, McAfee, Tate & Co., and J. M. McAfee & Co., each gave bond. The bond signed by witness as president, R. F. Maddox, J. M. McAfee and W. A. Haskins as securities, is the first bond witness knows positively to have been given by the railroad company for convicts. It is cheaper to work a large force of convicts than a small one; chief engineer, bookkeeper and other managers, except guards, would be the same for 250 as for 150; the company never had 250 at any one time within witness's knowledge; impossible to state relative value of 83 convicts for nine years and 250 for three years; more economical to work the 250 for three years.

" The failure to get the 250 convicts caused want of confidence in the enterprise and a doubt as to its ever being completed, and delayed the work when it might have been done. With ample means to properly feed, guard, care for and work 250 convicts, it is much cheaper than to work a less number for a longer time to make equal the days' work of two squads. But from the first organization of

the company until I left the road, there were times when I had to support them on a credit, by hard begging; and the greater the number, the greater the difficulty in supporting them. On the other hand, there were times when we could have hired out to better advantage one-half and worked the other half on the road, and greatly facilitated the enterprise, if we had had the full 250 convicts. On the whole, the convicts, with comparatively little help, have built the road thus far, for they have produced largely the values which will make the road."

Is not employed in this case, and has no agreement concerning it; did all he could as vice-president of railroad company until he " became virtually disconnected with the company." As I remember, on 1st April, 1876, the railroad company had no means to support the convicts, and J. M. McAfee & Co. held them and worked them, as stated in answer to direct interrogatory." Witness believed that J. M. McAfee & Co. had a written contract with the railroad, but finds none; but they were " treated as having worked under similar contracts with the two preceding companies."

" I believed that J. M. McAfee & Co. had a contract in writing with the Marietta & North Georgia Railroad Company similar to that of Wallis, Haley & Co., Field, McAfee, Tate & Co., but by reference to the book of minutes I find none; but that J. M. McAfee & Co. were afterwards treated as having worked under similar contracts with the two preceding companies. I have inquired of the secretary, H. M. Hammett, and he has no such paper in his office. I attempted to get original, but find that the contract was only by common consent of such of the stockholders as took any interest in the matter, and not in writing. The fact is that the railroad was about deserted by everybody except J. M. McAfee & Co., and there was nobody to contract with nor treat with, except as we met the stockholders individually. Col. W. A. Haskins subscribed $500.00 to support convicts we worked on the road, and became one

of the company of J. M. McAfee & Co; went into the company upon the condition that he should have a given number of convicts to work in his gold mine, the old Franklin mine in Cherokee county. This fact had escaped my memory until I was investigating the facts to answer your question.

" I have answered this question in my answer to direct interrogatory. I stated where they worked, but now remember, in addition, that a squad was worked for digging out cellar for Dr. A. Reynolds in Marietta. I have no means of knowing or ascertaining how many, or how long, the convicts leased to J. M. McAfee & Co. worked on the railroad. The Haskins squad of some twenty-five were carried from Canton to the Franklin gold mine, and remained there until they were carried to the upper counties in June, 1876. The remainder worked on the Marietta & North Georgia Railroad until our subscriptions gave out, and until, speaking for myself, I could not support them longer, and if anybody else could, they would not; and we were forced to hire and work them as we could, to support them, or surrender them to the state. ·I did not manage, hire, or work the convicts during this time, except when nobody else would, and it was a necessity to hold them, but was often trying to arrange to put them back on the road, and hence I can't answer your question with exactness.    *    *

" I have no books or record of any sort, and therefore answer from memory. My recollection is, about eighty to one hundred convicts were carried from Fannin to the Cherokee Iron Company (Mr. A. G. West, president). This force was increased from the jails. I did not keep the books showing the number and names, and cannot give names or number of the convicts worked for the Cherokee Iron Company.    *    *    When Maddox & Co. turned over the road in April or May, 1879, I hired a part of the force worked by them on the road to the Cherokee Iron Company, to support another squad in working on the road. Sometime in 1880 I removed fifty convicts from the Cher-

okee Iron Company to the Macon & Brunswick Rrailroad, and left, as I remember (not certain), about sixty convicts with the Cherokee Iron Company. This squad, less the discharges, remained with the Cherokee Iron Company until, as I remember, the summer of 1881, when they were turned over to the Georgia Railroad, Eager and his assistants on the Marietta & North Georgia Railroad. I remember that in 1880, W. R. Power, book-keeper for the Marietta & North Georgia Railroad Company, reported over ten thousand dollars paid to the company from the proceeds of this labor (which report is of file in the executive department), and expended on the road. The first convicts worked for the Cherokee Iron Company at forty cents per cord cutting coal wood; seventy-five cents per day for able-bodied men in ore bank. The Marietta & North Georgia Railroad Company were at all the expense of caring for them, and guarding, etc. There was quite a large squad, when received from Fannin, disabled, and requiring medical treatment. In December, after they went from the Cherokee Iron Company, as I remember, N. A. Eaves took charge and worked them under another contract, which I cannot state with accuracy, but the books will show. Then Maddox & Co. worked them for the Cherokee Iron Company. I cannot give their contract without the books. The last hiring by me, as president, to the Cherokee Iron Company was, as I remember, for about thirty-five or forty of the best hands. The Cherokee Iron Company agreed to pay $12.50 per month, and $7.50 for the remainder. For several convicts nothing was paid. Under this low contract, the Cherokee Iron Company was to pay all expenses of every kind. I hired the convicts to the Macon & Brunswick Railroad Company, as I remember, at $15.00 per month, *per capita*, and all expenses paid by the Macon & Brunswick Railroad, except the clothing. It is impossible to answer your question fully and accurately without the books, which I have not, and have no control over them. * * My recollection further is, that a part of the

proceeds of this labor was expended in taking up track and removing iron from the Memphis Branch railroad and repairing engine."

The Marietta & North Georgia railroad never has signed any contract or lease with the state for convicts, that witness remembers.

"I was president of the Marietta & North Georgia Railroad Company from 1874 to May or June, 1881. I have no means of telling how many convicts were delivered to said company since April, 1871. My recollection is that J. M. McAfee & Co. secured 104, turned over by Field, McAfee, Tate & Co., and I think G. M. Manning and McKinney carried about seventy or eighty of this number to Fannin county, to be worked on the road in June, 1876. That the Haskins squad was added to this number, but that a part stopped at White Path gold mines, and were afterwards carried to Fannin county. I remember no increase of the force received by J. M. McAfee & Co. from Field, McAfee, Tate & Co. from the jails, but I think there was. Some were discharged before they went to Fannin. In July, 1876, I think, forty of the Stevens hands were received and turned over to Gilmer county. Quite a number were discharged, and some pardoned, while in Gilmer and Fannin. About one hundred were carried to Cedartown. Then the force was considerably increased from the jails, but the number I cannot tell, not even an approximate. Next was about fifty from Broomhead in 1878. The remainder has been from the jails. All that Dr. Thomas Raines, surgeon, adjudged able-bodied, long-termed, were taken from the company April 1st, 1879, and place supplied by short-term men. After this, the force was increased from the jails until 1882, as I remember the company had over two hundred. I have not, and cannot give names or number or term of service. I have not the custody or control of any book or paper containing the information asked.

" As already stated, I cannot tell where and how each

convict has been employed or worked.    Wallis, Haley &
Co. worked altogether on the Marietta & North Georgia
Railroad, after removal to Marietta, and so did Field,
McAfee & Co., except squad sent to Haskins, until forced
to hire them out, as hereinbefore stated, to support them.
The Stevens hands worked in Gilmer on the grading for
several months, and were surrendered to the company,
and I sent them to Fannin, as before stated.    From June,
1876, to summer of 1877, the J. M. McAfee & Co. hands
worked in Fannin on the road; the citizens of Gilmer and
Fannin refusing to support them longer, they, with the
Stevens hands, were employed in cutting wood.    Of this
force about one hundred went to Cedartown, and a part
worked for the Cherokee Iron Company, and a part for
Macon & Brunswick Railroad until 1881.    But a part of
this time the force was less, and at others more.    When
the road was put in repair from Marietta to Canton in
1880, a force was turned over to me by Maddox & Co.    I
had no means to support them, and worked a squad of
forty or fifty on street leading from depot into Canton;
they worked there two or three weeks.    The road and con-
victs were turned over to me by Maddox & Co. without
a dollar to support them.    I had to work them as best I
could to support themselves, until I could make arrange-
ments to put them to work again on the railroad, put on
the grade north of Canton, supported by convicts worked
for Cherokee Iron Company and for Macon & Brunswick
Railroad, and by proceeds of operation of the railroad; I
have already stated work done by J. M. McAfee & Co. for
different parties.    A squad of about twenty worked for
J. M. McAfee at Canton on depot, as appears in book of
minutes.

"Joseph Kinsey is now president of the Marietta &
North Georgia Railroad Company; George R. Eager and his
associates ostensibly have possession and control of the
convicts.    George R. Eager, for himself and his associates,
made a contract for building the Marietta & North Georgia

Railroad in June, 1881, which is in writing and on the book of minutes; I can furnish a copy; have not done so, nor do I know positively the status of that contract now.

"George R. Eager is connected with the defendant's company. I do not know positively, of my own knowledge, what his connection now with the company is. Geo. R. Eager has the ostensible control of the convicts. I cannot furnish a copy of any contract of Eager with the railroad company, nor do I know positively, of my own knowledge, under what contract the convicts are now being worked, whether under the contract with Eager, above alluded to, or by the North Georgia Improvement Company, or how. * * Although a director, I have nothing to do with the management."

Complainants introduced John W. Nelms's former testimony, as follows: He is principal keeper of the penitentiary, and went into office January, 1877. Has been keeper since that time. Records in his office do not show the leasing of the convicts. There are no minutes kept to show who get the hands. There were none kept before I went into office. The records do not show the right of the person or persons who get them. Does not know the length of the lease to Wallis, Haley & Co. Have seen the bond given for convicts. Have not seen the lease. You have (to Judge Hopkins) the bond. Has not examined the minutes of the executive department for the lease of W., H. & Co., but may have done so— does not remember. Thinks he remembers that W , H. & Co. were to have a certain number of convicts at $11.00 per head. Does not remember to have seen the bond, and may have seen the contract. Gov. Smith leased the convicts under act of 1874, for five years. Knows that terms of act of 1874 were that the convicts were to be leased not over five years, and under his administration such was the practice. Does not remember whether the term of W., H. & Co. was for five years or for two or three. Made a statement on this point in first annual

report. Does not remember terms of Stevens's contract. Can make no statement as to terms upon which Governor Smith leased convicts, except Brown's reports and bonds of Alexander and others. Evidence in office is abundant that lease for all convicts under act of 1874 was for five years—say to 1879. On first of April, 1874, reports show 616 convicts in 1874. This was made basis of distribution of convicts up to April, 1879. Knows of no exception to this rule. Six hundred and sixteen was to be the basis of all convicts from 1876 to 1879, for leases ran that way—lessees claimed it as a right. Does not know if W., H. & Co. leased for themselves or the North Georgia Railroad. Only knows from the bonds and other sources that there were such people as W., H. & Co. Found records of them in office. On 20th October, 1874, does not remember how many squads of convicts there were. Did know once, but have forgotten. This was two years before he came into office. Does not remember when the Northeastern road surrendered convicts. Does not know when the Northeastern road convicts were surrendered to Tom Alexander. [Here Judge Hopkins read from page No. 3 of Nelms's answers the paragraph beginning, "That on the 20th October, 1875, there were ten," etc., and ending, " and this charge was recognized both by the lessees and by the state."]

Nelms resumed: "Answer was made up from reports of Brown, chief keeper. Has no personal knowledge of any fact stated in paragraph read by Judge Hopkins. Got his information from the records and from what the lessees said, and from the bonds on file. Does not personally know when the convicts of W., H. & Co. went into the possession of the North Georgia & Marietta Road, but learned from records that they went in 1876. Does not personally know under what lease W., H. & Co. were operating in October, 1875. His information comes from records of office. Does not know personally when the Northeastern Railroad surrendered their convicts.

After Penitentiary Companies 1, 2 and 3 were organized in 1876. they worked under the act of 1874 to 1879, and they paid under that act. Understood that those companies were organized to take convicts that might be forfeited. They'paid $11.00 *per capita* for convicts under act of 1874.

[Judge Hopkins here read from last clause in the contract of complainants with the state.]

Nelms resumed: "Does not know if the companies took the convicts under act of 1874 or under contract of 1876. They paid the same price as act of 1874. Furnished Marietta & North Georgia Railroad under act of 1874. Only knows this because the parties claimed it. Does not personally know under what law. Referred in his answer to the five years' lease made in 1875. Does not personally know that the Marietta & North Georgia Railroad had any convicts prior to 1876. Knows nothing of the facts stated in his answers which occurred before he went into office. Does not know if there was a distribution of convicts between 1876 and 1879, under the act of 1876, save the four referred to in his answer. Does not remember how much Companies 2 and 3 paid between April, 1876, and April, 1879. They may have paid about eleven or twelve hundred dollars apiece for convicts, at eleven dollars *per capita*. Have seen bond attached to the bill, found by Mr. Warren in executive office. Does not know if that was the bond that was lost. Were other bonds in his office, but governor had them removed.

Cross-examined:

"After he came into office. he could find monthly reports as to who had convicts. These reports gave the names, numbers, etc., of convicts that were held. Adopted a rule on the basis of 616, and gave out near *pro rata* among the lessees. Did this with the convicts that were forfeited. All lessees claimed this as the true basis. After organization of the penitentiary companies, allowed Lockett *pro rata* under act of 1874. Does personally know that he gave new convicts to Marietta & North Georgia Rail-

road after he came into office, in 1879. Gave to Marietta and North Georgia Railroad convicts by same rule as he gave to others. All parties stood on this rule.

Re-direct·

" Made up report from book myself. Convicts were distributed from jails according to the leases held. Convicts from expired leases were to go to Penitentiary Companies Nos. 1, 2 and 3, from 1876 to 1879. The Alexander convicts were distributed to Marietta & North Georgia Railroad and to Gov. Brown. The penitentiary companies got no convicts, except four, between 1876 and 1879, under act of 1876. Marietta & North Georgia Railroad gave Gen. Phillips fifty and Gov. Brown twenty-one of the Alexander convicts that were forfeited."

W. D. Grant stated that he never made to Nelms any statement except this: That up to April 1, 1879, J. T. & W. D. Grant were entitled, under their lease, to new convicts in the proportion of 180 to 116, and that after April 1, 1879, the complainants and company No. 6 would take all the convicts, without exception.

Affidavit of N. S. Eaves, in brief, as follows: Has been connected with management of road since 1877 ; railroad has always claimed convicts worked by McAfee, and *pro rata* of those coming in under a renewal of lease of J. M. McAfee & Co., and 250 from April 1, 1879, for three years. " We demanded and applied for hands under every section and clause of the law, and could have paid expenses of bringing them ; for Capt. West offered to advance the money, but we could not get them. We were always told before April, 1879, that we must wait until April, 1879, and get the two hundred and fifty, and when April, 1879, came we were told that we had them. Col. Nelms said to us before April, 1879, that he wanted to give us our quota, but was prevented by the other lessees, but that we were entitled to two hundred and fifty for three years from the first of April, 1879, and that we should have them. With this understanding, that all the convicts were to be dis-

tributed under the twenty year lease on the 1st of April, 1879, the principal keeper sent Dr. Raines to our camp, and took a large number of our very best long term men, and gave us back short term men, most of them inferior hands; also left some very inferior long term hands with them."

Certificate and affidavit of Nelms, principal keeper, showing that the railroad company had received, from April, 1876, to April, 1879, convicts equal to labor of one man for 417 years; from April, 1879, to April 1881, the equivalent of 429 years; and from April to Oct., 1881, the equiva lent of 100 years, making a total of 946 years. There was also a statement of the names, terms, when received, when discharged, etc., showing the number of convicts to have been 548, and the aggregate terms 1,824 years 9 months and 18 days.

After hearing the application for injunction, the chancellor passed the following order:

"After argument of counsel and consideration of this case, this court is of the opinion that the questions made in the amendment to the complainants' bill have been, in the main, passed upon and determined by the Supreme Court and this court heretofore. The second paragraph of the first section of the act of 1876 (page 41) has been construed by the Supreme Court (65 *Ga.*, page 70) to mean that the Marietta & North Georgia Railroad was entitled to two hundred and fifty convicts for three years *or longer, if necessary, to complete the grading of the road.* They hold further, that the penitentiary companies took their lease subject to this burden.

All questions as to whether the railroad company had complied with the conditions required by law necessary to entitle it to receive the convicts, have been heretofore determined by this court, under the direction of the Supreme Court, and are settled until they shall be passed upon by a jury, and the rights of the parties have been protected by a bond which the road was required to file by the Supreme Court.

The resolution of the general assembly, passed in 1883, as interpreted and enforced by the governor in the executive order introduced in evidence, does nothing more than was done by the original resolution of 1879 (which has already been passed upon twice by the Supreme Court) except in so far as it gives to the road able-bodied convicts, and prohibits the delivery to it of any women or old and infirm

convicts, and except in so far as it gives it the convicts until certain branch roads are completed.

The question as to the validity of this last clause is not now properly before the court, because it is not claimed that the road is using them or about to use them for any such purpose.

I am of the opinion that the resolution of 1883, in so far as it discriminates in favor of the road as to the kind of convicts to be deliv. ered to it, is unconstitutional and void, and ought not to be enforced.

This court is bound by the decision of the Supreme Court on the question as to the act of 1876 and the resolution of 1879, and can only consider the resolution of .1883 in so far as it differs from and goes beyond that act and resolution in its terms, that act and resolution having been interpreted by the Supreme Court, and the complainants being already fully protected by the bond that has been filed under that decision, and the order of this court in conformity thereto.

It is therefore considered and ordered, that this injunction issue as prayed for, restraining the defendant, John W. Nelms, principal keeper of the penitentiary, from carrying into effect that portion of the resolution of the general assembly of 1883, which requires him to deliver to the Marietta & North Georgia Railroad Company only able-bodied convicts, and prohibits the delivery to it of any women or old and infirm convicts, and that he be enjoined from making any other than a fair *pro rata* division of this class of convicts between the complainants and the Marietta & North Georgia Railroad Company.

As to the other prayers in the bill and amendment, it is ordered that the injunction be denied.

W. R. HAMMOND, J. S. C. A. C.

At Chambers, Nov. 3, 1883."

Both sides excepted. The complainants assigned as error that part of the judgment which denies the injunction prayed for; the railroad company assigned as error that part of the judgment which held the resolution of 1883 to be void in so far as it provided that no more women or old and infirm convicts should be furnished to the railroad.

This case has been before the Supreme Court several times, and will be found reported in 65 *Ga.*, 67, 499 : 67 *Ga.*, 565.

JAMES M. SMITH; HOPKINS & GLENN, for plaintiffs in error.

B. F. ABBOTT; HOKE SMITH, for defendants.

STEWART, Judge.

Complainants, Penitentiary Companies Nos. 2 and 3, filed their bill in Fulton superior court, against defendants, the Marietta & North Georgia Railroad Company, of Cobb county, and John W. Nelms, principal keeper of the penitentiary, of Fulton county; in which bill complainants alleged that, under the act approved February 25th, 1876, the governor was authorized to lease out the convicts of the state for the term of twenty years: that on the 21st of June, 1876, the governor, in pursuance of said act, entered into a contract with the Dade Coal Company and complainants, by which he did lease the said convicts to said three companies for the term of twenty years, from April 1st, 1879; that by the provisions of said act, before the lessees of said convicts were entitled to any of said convicts, two hundred and fifty of them should be assigned to the Marietta & North Georgia Railroad Company for the space of three years. That the governor, in pursuance of said act, did assign said railroad company the number to which it was entitled, and that since that time said company was claiming more of said convicts; and that said Nelms, well knowing that said company had received all it was entitled to under said act, was assigning to it more convicts, and threatened to continue to assign convicts to it. All this, they allege, was contrary to law, and in disregard of the rights of complainants.

To this bill an answer was filed by Nelms and the railroad company, in which they insisted that the railroad company had not received the number of convicts allowed under the act of 1876. They also insisted that the superior court of Fulton county had no jurisdiction of said case.

A hearing was had before Hon. George Hillyer, Judge of the Atlanta circuit; his decision was brought to this court for review. (See case reported in 67 *Ga. Rep.*, page 565.) This court then held that the superior court of Ful-

ton county had jurisdiction of said case. Nelms, as principal keeper of the penitentiary, was enjoined from turning over the convicts, as prayed for. It was provided that the injunction might be dissolved by giving bond. It appears, from the record in the case, that bond was given by the railroad company. It further appears that on the 16th of October, 1883, complainants amended their bill, repeating the charges in the original bill and amendments, and further alleged that the contracts made by the state of Georgia with Georgia Penitentiary Companies One, Two, and Three, were still of force. That complainants had complied with their part of said contracts. They further allege that, since the date of said contracts, the Marietta & North Georgia Railroad Company has received largely more than two hundred and fifty convicts for three years. Complainants charge, that on the 26th day of September, 1883, the legislature of Georgia passed the following resolution:

"*Resolved* by the Senate, the House concurring, that the governor be, and he is hereby instructed to direct the keeper of the penitentiary to turn over to the Marietta & North Georgia Railroad Company two hundred and fifty able bodied convicts, to be worked for the benefit of said railroad company for the full space of three years, or until the main line of said railroad is completed to the North Carolina line, and the Duck Town branch is completed to the Tennessee line, and the Dahlonega branch is finished to its intersection with the Gainesville and Dahlonega Railroad.

"*Resolved, further*, that no more women convicts, nor old and infirm convicts be furnished said company."

Complainants further allege that the convicts mentioned are part of those included in their contract, and for which they pay hire.

They insist that said resolution impairs the obligation of the contracts they have made with the state, and is, therefore, null and void. They charge that John W. Nelms, principal keeper of the penitentiary, will deliver the convicts to the defendants, unless restrained, and enjoined by the courts. They claim that their damages are irrepara-

Georgia Penitentiary Cos. Nos. 2 and 3 *vs.* Nelms, principal keeper, *et al.*

ble; and, therefore, pray that an injunction issue, restaaining Nelms from delivering, and the railroad company from receiving, the convicts.

To this bill, as amended, defendants filed a demurrer and answer, by which they insist that said resolution does not impair the obligation of any contract; and they also claim, that there are no such corporations as Georgia Penitentiary Companies Nos. 2 and 3.

A hearing was had before Hon. W. R. Hammond, judge of the Atlanta circuit. Much testimony was introduced, and after considering the case, Judge Hammond held that most of the questions made in the bill, as amended, had been decided by this court, in the case reported in 65 *Ga.*, *Rep.*, page 70. He held that so much of the resolution of 1883 as provided that "no mor women convicts, nor old and infirm convicts be furnished to the railroad company," was null and void; and John W. Nelms was restrained by injunction from carrying into effect this part of said resolution. He refused to grant an injunction, restraining Nelms, as principal keeper, from delivering convicts under the resolution (except as before stated), holding that the other questions made had already been decided by this court.

To this ruling and decision of Judge Hammond both complainants and defendants sued out bills of exceptions, and said decision is now here for review. Pending the argument here, defendants in error withdrew their bill of exceptions.

1. The act of the legislature of this state, passed in 1876, authorizing the governor to lease the convicts of the state to certain penitentiary companies, is constitutional and valid. There is no provision of the conttitution of this state which prohibits the legislature from authorizing the governor to enter into contracts disposing of the labor of the convicts of the state; provided that, in making such contracts of lease, the state reserves the police power over the convicts, and this was done, both under the acts of

348    SUPREME COURT OF GEORGIA.

Georgia Penitentiary Cos. Nos. 2 and 3 vs. Nelms, principal keeper, et al.

1874 and 1876. The validity and legality of the contracts between the state and complainants was fully recognized by this court in the decision of the court reported in 35 *Ga.*, page 504.

2. A contract of lease made by the governor with Georgia Penitentiary Companies Numbers One, Two and Three, are valid and binding both upon the state and said companies.

From the record in the case, it appears that his excellency, James M. Smith, governor of Georgia, under the provisions of the act of 1876, advertised for bids from those who desired to lease the convicts of the state, and after considering the same, declined to accept the bids as in said contracts stated; but did enter into the following contracts with said parties, to-wit:

" WHEREAS, in the opinion of the governor, none of said bids ought to be accepted (they being the only bids offered for any considerable number of convicts), as they are so in conflict as to the amounts for the whole, or for half, as to make it doubtful which would be the best for the state; and

" WHEREAS, all of said bids are too low, in the opinion of the governor, and he has informed said bidders that he cannot accept their bids upon the terms and for the prices therein specified, but that the said three companies may take the whole of said convicts for the sum of five hundred thousand dollars, to be paid in twenty equal, annual installments, commencing at the end of the first year after the termination of the present lease,—the Dade Coal Company taking the three hundred long-term men bid for by it, to be kept up constantly to that number of able-bodied men, if there be, and so long as there shall be, so many in the penitentiary, to be used in mining, as provided for by the statute; and the other two companies dividing the remainder into two equal parts, and the number that each of the two last mentioned companies has, shall be kept equal during the period of the lease; the convicts held by each company to be employed in the labor specified in the statute. The annual installments to be paid into the treasury of the state at the end of each year during the period of twenty years; such installments being the sum of twenty-five thousand dollars. Each of said companies to pay its *pro rata* share of said sum. The principal keeper of the penitentiary, under the direction of the governor, shall adjust *pro rata* shares of said sums between said companies in proportion to the number of convicts held by each during the year; but in no case shall adjust-

ment operate so as to reduce the annual rental of said convicts below the sum of twenty-five thousand dollars. Each company shall pay the amount of annual hire fixed by such adjustment promptly on the last day of each year.

"And the said three companies, each acting for itself as a separate and distinct company, and each assuming its own proportion of the obligations above mentioned, and no more, having accepted the foregoing modifications of their respective bids suggested by the governor; it is agreed by said companies, each one acting separately for itself, and by James M. Smith, governor of said state, that the said convicts be leased to said three companies above named, in the proportion as to the number of convicts and upon the terms hereinbefore specified; each company to give bond, with approved security, for its own part of the obligation devolved upon it by the acceptance of the bid, modified as aforesaid, in the following sums, to-wit:

"The Georgia Penitentiary Company No. 1, composed of the Dade Coal Company, in the sum of twenty-five thousand dollars.

"The Georgia Penitentiary Company No. 2, composed of B. G. Lockett, L. A. Jordan, W. B. Lowe and J. B. Gordon, in the sum of thirty-seven thousand five hundred dollars; and

"The Georgia Penitentiary Company No. 3, whose stockholders are Thomas Alexander, W. D. Grant, W. W. Simpson, John W. Murphey and William H. Howell, the sum of thirty-seven thousand dollars, each of said bonds to have proper conditions for the management, control and safe keeping of said convicts according to law and to the rules and regulations prescribed for the government of the penitentiary, and in view of the fact that existing contracts of lease may be canceled before the first day of April, 1879, (the time when all the present leases expire) it is further agreed that in all such cases the lessees under this contract shall take possession of all convicts which may thus fall upon the hands of the state, and shall hold, manage and control the same according to the provisions of this contract, and of their bonds given under the same, and shall be respectively bound to pay for said convicts until the first day of April, 1879, at the rate of eleven dollars *per capita* per annum."

This contract of lease was signed by the governor and by the officers of the penitentiary companies named. And in pursuance with said contract bonds were given, and on the 22d day of June, 1876, an executive order was made by the governor, accepting the bonds and contracts; and by said order the companies were declared to be corporations, and the names of the officers of said companies were entered on the minutes of the executive department.

Under the contracts thus made by the lessees, should they fail at the end of any year, to pay the amount agreed upon for the hire of the convicts, by an act passed in 1876, the comptroller general could issue an execution for said amount not paid.   Under the contract, as herein set forth, Penitentiary Companies Nos. 1, 2 and 3 contend that they are entitled to the services of all the convicts (except 250 to Marietta & North Georgia Railroad for three years,) for a period of twenty years from April 1, 1879, the date at which leases under the act of 1874 expired.   Defendants insist that the Marietta & North Georgia Railroad Company was an incorporated railroad company working convicts when the act of 1876 was passed, and as such, insist that they are entitled not only to 250 for three years, but are entitled to a re-lease of convicts under the act of 1876, in preference to the rights of complainants.   And defendants further insist that the state of Georgia, notwithstanding lease contracts have been entered into by it, has the right to withdraw from such contracts at its pleasure.

The constitution of the United States provides that no state shall pass any law impairing the obligation of contracts (See Sec. 9, Const.).   This court holds that the inhibition in the constitution that prevents a state from passing a law impairing the obligations of contracts, applies to contracts made by the state, as well as to contracts made between citizens of the state.

Cooley on Constitutional Limitations very pertinently submits the following inquiry: "Is a grant from a state excluded from the operation of the provision?   Is the clause to be considered as inhibiting the state from impairing the obligations of contracts between two individuals; but has excluded from that inhibition contracts made with the state itself?   The words themselves contain no such distinction: they are general, and are applicable to contracts of every description."   Story, in his Commentaries on the Constitution of the United States, insists that a grant by the state, as well as executed contracts, comes within the prohibition of

that clause which prohibits a state from passing laws which impair the obligations of contracts, and this he holds, would be true, whether the contract be made by direct legislative act, or by an agent of the state in pursuance of law. We hold that the obligation of a contract made by the state with one of its citizens cannot be impaired by legislative act any more than if the contract was made between two of the citizens of the state; that contracts made by the state with a citizen of the state come within the inhibition of the constitution of the United States upon the subject of a state's violating the obligations of contracts by legislative act. A state being sovereign in the eye of the law, is presumed to be the embodiment of all the wisdom, honor, justice and virtue of its citizens; and how could this great commonwealth lay claim to such a high standard of excellence, if she should break her contracts with impunity? If there be reason and justice in the rule that the obligations of contracts between citizens should not be impaired by legislative act, when the state is a party to the contract, is it not a stronger reason why the rule should be maintained and upheld?

Contracts are the springs of trade, commerce and business; they determine the confidence of man in the conduct of his fellow; the virtue of the citizen, as well as national life, can rest on no safer foundation than the faithful fulfillment of contracts. That contracts are to be maintained in a republican form of government, is a rule that is fundamental.

We find that the state, through its chief executive, has leased its convicts for twenty years, and is to receive $25,000 per annum. Whether the contract thus made was proper, or whether now one more remunerative to the state could be made, are considerations by which this court cannot afford to be influenced; it is the mission of the courts to enforce, and not to make, contracts. The state can change its penitentiary system; can change its modes of punishment, may reduce felonies to misdemeanors or make, pros-

pectively, misdemeanors felonies, but as long as the state continues its present system and modes of punishment, contracts made, in having the same enforced, are binding on the state. If this were not so, with what claim of right or degree of propriety could the state insist that the lessees should perform their part of the contracts, as hereinbefore set forth?

3. The legislature, in 1883, passed a joint resolution instructing the principal keeper of the penitentiary to turn over to the Marietta & North Georgia Railroad Company two hundred and fifty able bodied convicts, to be worked for the benefit of the company, until the line of said road, together with certain branch roads, shall have been completed. And complainants, by their amended bill, allege that, in pursuance with the resolution, Nelms, as principal keeper of the penitentiary, unless enjoined, will deliver the convicts therein mentioned to the railroad company.

This resolution upon its face purports to be, and is, a new grant by the state to the railroad company. It was passed at a time when, by contract between the governor of the state and the penitentiary companies, the labor of all the convicts, for twenty years, had been leased for the sum of twenty-five thousand dollars per annum. This resolution, if carried into effect, will withdraw from the penitentiary companies the labor of two hundred and fifty convicts, which they would be entitled to under their contracts made with the state; and there is no offer or tender of compensation by the state.

This court holds that the resolution is unconstitutional and void, as it violates the obligations of contracts entered into by the state in leasing its convicts. We fully appreciate the rule that the courts should not hold an act of the legislature unconstitutional, unless its unconstitutionality is clear and manifest, but in view of that provision of the constitution of the United States which prohibits a state from passing laws which impair the obligations of contracts, as well as provisions of our own state constitution which

provides that private property shall not be taken for public use without just compensation, and that no grant of special privilege or immunity shall be revoked, except in such manner as to work no injustice ; and again, that legislative acts in violation of the constitution of the state, or of the constitution of the United States, are void, and the judiciary shall so declare them ; under these constitutional provisions, we feel constrained to hold said resolution null and void.

The resolution of 1883 does not reserve the police power of the state over the convicts, and while the state may contract away the labor of the convicts, it has no power to part with the police regulations over the convicts; for this reason the resolution is void, and should not be enforced. We deem it scarcely necessary to say further, that, by legislative act to take the property of A. and give it to B. is not only a violation of constitutional law, but a violation of the broadest principles of justice and right. It will be remembered that neither in the resolution, evidence, or argument of counsel has it been shown that it is necessary for the protection of the lives, comfort or safe keeping of the convicts, or for the protection of society, that said resolution should be enforced, but the same, without more, directs the principal keeper of the penitentiary to turn over two hundred and fifty convicts to the railroad, the labor of whom, by contract, had been disposed of to the penitentiary companies. We therefore hold that Nelms, as principal keeper of the penitentiary, be enjoined from delivering to the railroad company any convicts under said resolution, and that the railroad be enjoined from receiving any under said resolution.

4. Under the act of 1876, the Marietta & North Georgia Railroad Company was entitled to the service of two hundred and fifty convicts for three years, and after said railroad company has had the service of said convicts for three years, the companies known as penitentiary companies are entitled to the same, unless the railroad company

can bring itself within the proviso of the act of 1876 by showing that, as an incorporated railroad company, by authority of the state, when the act of 1876 was passed, it was working the convicts of the state, and that it made application for a re-lease of convicts, as required by law, before the state leased the convicts to the penitentiary companies. This question of fact, we hold, should be submitted to, and passed upon by, a jury; that the same should be established by competent legal evidence, not the vague recollection or supposition of witnesses, but evidence showing that the officers of the railroad company applied for and received and worked the convicts of the state as an incorporated railroad company.

Should the railroad company establish the fact that it has a superior right to convicts to that of the penitentiary companies, then such a decree should be framed as would authorize the railroad company to have such number of convicts, and for such length of time, and for the purpose as set forth in the proviso to the act of 1876. But, on the contrary, should the railroad company fail to establish any right to convicts, other than the two hundred and fifty for three years in that event, we hold that a court of equity has the power to decree that the convicts held now by the railroad company be delivered up, so that the same can be turned over to the penitentiary companies.

In looking through the evidence contained in the record in this case, we hold that the injunction granted in this case should be so modified as to enjoin the principal keeper, Nelms, from delivering, and the railroad company from receiving, any more convicts, until the right of the railroad company to receive more shall have been established by law; and as this direction will require the principal keeper, Nelms, to turn over convicts which will hereafter be received by him, we direct that the Penitentiary Companies Nos. 2 and 3 file with the clerk of Fulton superior cour bond, with good security, conditioned to pay the railroad company any damages which it may sustain on ac-

count of the service of convicts turned over to the penitentiary companies which should have been received by the railroad company.

We find that this is the fifth (fourth?) time this subject-matter of litigation, first in one form and then in another, has been before this court for consideration. It is the desire of this court, and doubtless is of all parties to the case, that the rights of complainants and defendants should be finally adjudicated and settled. We therefore direct that complainants, on the trial of the case, have leave to so amend their bill as to have any claim for damages which they have already sustained, or which they may hereafter sustain, on account of the loss of service of convicts received by the railroad company to which it was not entitled, submitted to the court and jury, and the same adjudicated, on the trial of this case.

5. Under the contracts between the state and the penitentiary lessees, the lessees have a vested right to the labor of the convicts so leased, and the legislature has no power, under the constitution and laws of this state, and of the United States, to deprive the lessees of this right to the labor of the convicts thus leased.

In a bill brought by complainants against defendants in Cobb superior court, and which case was brought to this court for review, this court then held that it was competent for the state to relieve itself of the burden incident to the feeding, clothing, guarding and other expenses of the convicts, by an arrangement with any person to take charge of them and to confine them during their terms of sentences against them. See 65 *Ga*, page 504. The decision, as then rendered, in effect, decided the question that the lessees had a vested right in the labor of the convicts, the state reserving the police power over the convicts. If the lessees have a vested right in the labor of the convicts, then that right cannot be taken away without tendering just compensation. We hold that the labor of the convicts, as contracted for, was not a mere expectancy, but was such a property right as to support a valid contract.

Georgia Penitentiary Cos. Nos. 2 and 3 vs. Nelms, principal keeper, et al.

6. The police power of the state over the convicts leased to the penitentiary companies is reserved and secured by the contracts of lease to the state, so that the state has entire control of the moral and physical condition of the convicts, and can make all needful and necessary regulations as regards the safe keeping, feeding, clothing and medical treatment of the convicts.

The state, in the exercise of its sovereign rights for the protection of society in the enforcement of the judgments and sentences of the courts, as well as for the humane treatment of its convicts, should reserve to itself the police power over its convicts. This right was reserved by the acts of 1874 and 1876, and the same was made a condition in the lease contracts, as therein stated.

7. Under the act of 1876, persons leasing convicts are called corporations in the manner and for the purpose as specified in the act.

Defendants insist that complainants are not corporations. We hold that the state has the right to create an agency of one or many persons, to aid the state in the enforcement of the criminal laws of the state, by having the convicts of the state guarded and kept at labor in accordance with the judgments of the courts, by which the convicts are required to be imprisoned and worked. The fact, that such an association of persons is loosely called corporations, does not render invalid contracts made by the state with such persons; and the state having in this manner, and for the benefit of the state, contracted with such persons, calling or denominating them corporations, would not authorize the state to take advantage of that fact; and the railroad company claiming rights subordinate to the rights of the state, can take no advantage of the same.

Judgment reversed.

Cited for plaintiffs in error: Lease contracts, 65 *Ga.*, 68. Vested right, Code, §§4995, 5025, 5274; 8 Wheat., 92; 4 Pet., 594; 15 Cal. Rep. 429.

Cited for defendants in error: Principal keeper not enjoined, 55 N. Y., 390 ; 46 *Ga.*, 315 ; Code, §5015 ; 4 Wal., 475 ; 46 *Ga.*, 350 ; 43 *Ib.*, 471 ; High on Inj., 1326 ; 9 Wheat., 738 ; 16 Wall., 203 ; 4 *Ib.*, 475 ; 43 *Ga.*, 474 ; 45 *Ib.*, 365. Police power, Code, §§4993, 5029 ; 56 *Ga.*, 67 ; Cooley on Con. Lim., 149, 339, 345, 475, 706, 710, 712 ; 97 U. S. Rep., 25 ; 94 *Ib.*, 645 ; 33 *Ga.* supplement, 166 ; 17 *Ib.*, 56 ; 65 *Ib.*, 500. No vested right in labor of convicts, Cooley Con. Lim., 149, 345, 439, 440, 366 ; 10 Howard, 511 ; 101 Ill., 278 ; 43 N. J., 571 ; 1 N. H., 199, 304. No proper parties, Code, §5068 ; Abb. T. E., 20 ; 16 Wend., 605 ; 24 Howard, 283 ; 55 *Ga.*, 639 ; 63 *Ib.*, 679 ; 57 *Ib.*, 231 ; 16 John., 34 ; 11 Maine, 54 ; 16 Ala., 448 ; 48 Cal., 494 ; 54 Ala., 471.